ATCHISON, TOPEKA & SANTA FE RAILROAD COMPANY
v. ALLIE MAY HENRY.

**No. 11131.**

RAILROADS— *Width of Crossings—Knowledge of Requirements Presumed.* Railroad companies must know the requirements of harvesting-machines in general use throughout the state as to the width of highway-crossings necessary to enable persons to drive them safely over, and a failure to provide suitable crossings for such machines, whereby injuries occur, is negligence.

Error from Osage district court; WILLIAM THOMSON, judge. Opinion filed March 11, 1899. Affirmed.

*A. A. Hurd, O. J. Wood*, and *W. Littlefield*, for plaintiff in error.

*Waters & Waters*, for defendant in error.

The opinion of the court was delivered by

DOSTER, C. J. : This was an action for damages brought by Allie May Henry, widow of Frank B. Henry, against the Atchison, Topeka & Santa Fe Railroad Company for negligently causing her husband's death by its failure to maintain a highway-crossing suitable for the passing of a harvesting-machine over it, whereby the machine became stuck upon the track, and the engine and train collided with it.   The case has been reviewed by this court before (*Railroad Co. v. Henry*, 57 Kan. 154, 45 Pac. 576), and the substantial facts are stated in the report of the former decision.   It was reversed because of misdirection of the jury.   Upon the second trial the plaintiff again recovered a verdict and judgment, from which error has been prosecuted to this court.   The alleged defects in the highway-crossing were insufficiency of width to accommodate the harvesting-machine, and the failure to lay the planks composing it to correspond with the angle made by the railroad and the highway.   The railroad company's defense to the action was that the crossing maintained by it was at a proper angle and of sufficient width to accommodate all the ordinary travel over it; that the harvesting-machine was of an unusual width, and that it had no knowledge that a machine of such width and requiring such highway accommodations was in use.   The jury made special findings of fact, of which those material for reference are as follows :

"Q. 2.   Did Edmund Stredder know the condition of the crossing in question at the time he attempted to cross over it with the binding-machine on the day of the accident?   A.  Yes.

"Q. 3.   Could Edmund Stredder have passed over

the crossing in safety had not one of his horses shied and crowded the others so as to cause the wheel at the end of the sickle-bar to run off at the end of the plank crossing and catch on the rail of the track? A. No.

"Q. 4. Did Edmund Stredder before attempting to pass over the crossing with his binder know what the width of the crossing was, and believe it was of sufficient width to admit of the binding-machine passing over it? A. He believed it was of sufficient width.

"Q. 5. Was there a plank crossing of the railroad track at the place where Edmund Stredder attempted to cross with his binding-machine on the day of the accident? A. Yes.

"Q. 6. If you answer the last question in the affirmative, then state how many planks there were between the rails, and how many on the outside of each rail. A. Four between and one on outside of each rail.

"Q. 7. If you answer that there was a plank crossing at that place, then state the length of the planks at that crossing. A. Fourteen feet.

"Q. 8. If you answer that there was a plank crossing at the point in question, then state the thickness and width of the planks. A. Two and one-half inches thick by eleven inches wide.

"Q. 9. If you answer that the space between the rails at the crossing was not all planked, then state what part or portion of it was not planked. A. None except room for flanges on wheels.

"Q. 10. If you answer that there were planks at the outside of each rail of the crossing in question, then state the width and thickness of such planks. A. Two and one-half inches thick by eleven and one-half inches wide.

"Q. 11. How many horses did Edmund Stredder have drawing the binder at the time he attempted to pass over the crossing in question? A. Three.

"Q. 12. Of what make or manufacture was the binding-machine in question? A. Deering binder, seven-feet cut.

"Q. 13. How many wheels were there that carried the binder or on which it ran? A. Two.

"Q. 14. What was the distance from the outside of the main or drive-wheel and the outside of the small wheel that carries the sickle? A. Ten feet and four inches.

"Q. 15. Could the binding-machine in question have been taken over the crossing where the accident occurred with safety if drawn by two horses, and with the exercise of ordinary care and prudence on the part of the driver? A. No.

"Q. 16. If you answer 15 in the negative, then state why it could not. A. The surface on the approach was too narrow.

"Q. 17. Could the binder in question have been driven over the crossing in question, if drawn by three horses abreast, without getting caught or stuck upon the rail, if the outside horses had traveled outside of the planks and between the ties? A. No.

"Q. 18. Was there anything to prevent a horse from walking over the track outside of the planks at the crossing in question? A. Yes.

"Q. 19. If you answer the last question in the affirmative then state what there was to prevent a horse crossing the track at the end and off the planking. A. The ties and rails.

"Q. 20. Did the outside horse, called 'Old Bony,' crowd the other horses so as to cause the small wheel carrying the sickle-bar to run off the planking and get caught upon the rails of the track? A. Yes.

"Q. 21. When Edmund Stredder drove upon the crossing just before the accident, with the machine in question, did both the drive-wheel and the small wheel carrying the sickle-bar run upon the planking of the crossing? A. No.

"Q. 46. Had Edmund Stredder, whose binder was stuck on the crossing, the day before that crossed the same kind of a crossing on defendant's track with the same machine without any difficulty or trouble? A. Similar crossing.

"Q. 47. What was there to prevent Edmund Stredder from leading the third horse so as to have his machine pulled by the team only over the crossing,

outside of the extra trouble or care? A. Inconvenience.

" Q. 48. At the time of the accident in question, could Edmund Stredder have crossed over this crossing with the machine with a team of two horses easily, and without any trouble or danger of getting off from the crossing? A. No.

" Q. 49. If you answer the last question in the negative, then state why he could not have driven it over the crossing with a team of two horses in safety at that time. A. The approach was too narrow.

" Q. 50. Could the binder in question have gone over the crossing so as to have left a foot and a half from the outside of its wheels on each side of the ends of the plank on each side? A. No.

" Q. 51. If you answer the last question in the negative, then state how much room would have been left on the outside of each of the wheels on the plank crossing. A. One inch on each end.

" Q. 52. At what angle did the railroad cross the alleged public road at the time of its construction? A. Seventy degrees and twenty-eight minutes.

" Q. 54. Did the traveled track of the road both north and south of this crossing make a bend so as to make the crossing at more nearly a right angle? A. No evidence to show that it did at this particular time.

" Q. 77. Do you find from the evidence that Edmund Stredder had as much knowledge of the character and condition of the crossing where this accident occurred, and of the Deering binder, and of the breadth of crossing required by it when pulled by three horses, as the defendant company had before the time that he attempted to drive over the crossing with the machine so pulled by three horses? A. Yes.

" Q. 78. Did Edmund Stredder before he got upon the crossing believe that he could drive over it with the machine pulled by three horses with safety, without the machine getting caught or stuck upon the crossing? A. Yes.

" Q. 79. Were the opportunities of Edmund Stredder for knowing the condition of the crossing as to

being safe over which to drive a machine of this character pulled by three horses as good or better than those of the railroad company? A. It was as good.

"Q. 80. Do you find from the evidence that Deering binders like the one with which the train collided were in general use in the vicinity of the crossing in question prior to that time? A. No.

"Q. 82. Had Edmund Stredder been acquainted with the crossing where this casualty occurred ever since the railroad was constructed over that highway? A. Yes.

"Q. 83. Do you find from the evidence that Deering binders of the size of the one with which the train in question collided had ever been transported over this railroad crossing or upon this highway pulled by three horses prior to the date of the derailment of the train? A. No.

"Q. 84. Do you find from the evidence in this case that Deering binders of the size and description of the one with which this train collided had been transported over the crossing in question along that highway prior to the date of the collision and derailment of the train? A. No.

"Q. 86. Does a Deering binder of the size and description of the one in question require a greater width of crossing when drawn by three horses than when drawn by two? A. Yes.

"Q. 87. Do you find that the railroad company had knowledge that Deering binders of the size and description of the one with which the train collided were transported over and along the highway in question prior to the date of the derailment of the train. A. No.

"Q. 89. Do you find from the evidence that Edmund Stredder was the first person that ever attempted to pass over the crossing with a Deering binder drawn by three horses? A. Yes.

"Q. 90. Did Edmund Stredder, prior to the time his binder became stuck on the crossing in question, know or have reason to believe that Deering binders such as the one in question could not be safely taken

over this crossing when drawn by three horses without being caught or stuck upon the railroad-track? A. No.''

There is nothing in these findings which acquits the plaintiff in error of the charge of negligent maintenance of the crossing. It is true that Deering binders of the size and description of the one in question in this case had never been transported over this particular crossing prior to the time of the accident, and it is also true that the evidence did not show that Deering binders like this particular one were in general use in the vicinity where the accident occurred. The jury, however, do not find that binders other than those of the Deering make, and of a size and description like those of Deering, were not in general use in that vicinity or had not been transported over that particular crossing. It is also true that Stredder, the driver of the binder, had as much knowledge as the railroad company of the width and other conditions of the crossing, and that he had driven the machine over a similar crossing the day before. None of these matters, however, will avail to excuse the railroad company. The statute requires railroad companies to maintain highway-crossings at least twelve feet wide. That is the minimum, but if the necessities of public travel require them of greater width, railroad companies must take notice of the fact and establish them accordingly.

Kansas is a wheat-growing state, and binders and harvesting-machines of all kinds are in common use throughout its limits. Railroad companies must know the requirements of harvesting-machines at highway-crossings, and they cannot be excused from the obligation to maintain crossings of a width sufficient to accommodate the machines in general use in the state

upon the ground that they did not know that one of more than ordinary width had been introduced in a particular community and was liable to be driven over the crossings there. While they may not be required to take immediate notice of recent and extraordinary enlargements of the size of harvesting-machines as soon as the inventions are put upon the market, and immediately to improve their highway-crossings to accommodate such new inventions, they nevertheless are chargeable with knowledge of the requirements of such machines as are in general use in the agricultural states through which they pass. There is, as before remarked, nothing in the findings to indicate that machines of the size of the Deering binder in question were not in general use in the vicinity where the accident occurred. In fact, there is  nothing in the findings to indicate to persons without special knowledge upon such matters that the machine in question was one of more than usual size or width. Its width is stated, but we do not judicially know from that whether it was wider or narrower than the average. We infer, however, from the arguments of counsel that it was wider, and have viewed the case accordingly.

Passing beyond the findings of the jury to the evidence in the case, it appeared in testimony that the accident in question occurred in Ellsworth county, and that that county is in the wheat belt of the state, a region where wheat-growing is more general than in other parts, and that Deering machines of the size and kind in question were, and for ten or twelve years had been, in common use in that part of the state. While no specific findings were made that Ellsworth county is in the wheat belt, and that the machine in question was in general use in the wheat belt, these

matters, so far as essential to the plaintiff's recovery, are included in the general verdict and operate as much in plaintiff's favor as though they had been specifically found. It matters not that Stredder had as much knowledge as the railroad company of the suitability of the crossing for the purpose of driving harvesting-machines over it. The case is not determinable upon the strength of what Stredder knew or did not know, nor upon presumptions as to what the railroad company in fact knew, but upon what it as a matter of general knowledge was required to know.

Some exceptions were taken to the reception of evidence in behalf of the defendant in error, and some objections were made to instructions given to the jury. We have examined these claims of error. They are unfounded. The judgment of the court below is affirmed.

JOHNSTON, J., concurring.

SMITH, J. (dissenting): I cannot agree with the majority of the court. Liability of the railroad company for the death of Frank B. Henry is made to depend upon a conclusive presumption fixed upon it, of which no contradiction is permitted, to the effect that it had knowledge or ought to have known that Deering harvesters of unusual width were in use in the wheat belt of Kansas.

This, in my judgment, is not one of the cases where the rights of a party should be dependent upon the doctrine of constructive knowledge. Such considerations rightfully enter into a case involving a claim of immunity from punishment, based upon ignorance by a violator of the law, where public policy demands that no one should plead lack of knowledge as an excuse for its infraction. Here, however, the matter is

Railroad Co. v. Henry.

decided by interposing a positive obligation to know
a thing — a mere fact in the case, when, as disclosed
by the evidence, the company had no actual knowl-
edge of it.   The railroad company more than satisfied
the minimum obligation resting upon it when it con-
structed a crossing fourteen feet wide.   When this
case was here before, Chief Justice Martin said :

"The evidence does not show whether the machine
in question was of unusual width or not, and, if its
width was exceptional, and it was an uncommon oc-
currence for a vehicle or machine requiring so much
breadth of crossing for its accommodation when drawn
in the usual manner, it would be unfair to charge the
railroad company with notice that a crossing of greater
width was necessary."  (57 Kan. 154, 45 Pac. 576.)

The following is a summary of the facts found by
the jury : That Deering binders the size of this one
had never been transported over the railroad-crossing
or upon this highway, pulled by three horses, prior to
the derailment of the train ; that Stredder, the owner
of the machine, had as much knowledge of the char-
acter and condition of the crossing where the accident
occurred, and of the Deering binder and of the breadth
of crossing required by it when pulled by three horses,
as the railroad company had before the time he at-
tempted to drive over the crossing ; that on the day
before the accident he crossed the same kind of a cross-
ing over the railroad-track with the same machine
without any difficulty or trouble ; that the evidence
did not show that binders like the one with which the
train collided were in general use in the vicinity of
the crossing in question prior to the time of the acci-
dent ; that the railroad company had no knowledge
that Deering binders of the size and description of the
one with which the train collided were transported
over and along the highway in question prior to the

date of the accident; that Stredder was the first person who ever attempted to pass over the crossing in question with the Deering binder drawn by three horses.

Again, the jury was asked and made answer to this question:

"Q. 90. Did Edmund Stredder, prior to the time this binder became stuck on the crossing in question, know or have reason to believe that Deering binders such as the one in question could not be safely taken over this crossing when drawn by three horses, without being caught or stuck upon the railroad-track? A. No."

If Stredder, who owned, used and operated the machine, did not know or have reason to believe that a Deering binder like the one in question could not be safely taken over this crossing when drawn by three horses, how could the railroad company be expected to know? If the railroad company must know of the progress made in the manufacture and use of improved farm machinery by which the width of harvesting-machines was increased, thus demanding a corresponding increase in the width of road-crossings, it is charged with a greater knowledge on the subject than the farmer had, whose duties required him to use and operate said machine, and haul it from one place to another. While the railroad company may often transport such harvesters, and its employees may see them in the fields adjacent to the track, yet their knowledge of their width and practical working must be exceedingly limited compared with the information gained by a farmer who daily cuts his grain with this implement during the harvest season.

The railroad company and its employees were in a state of ignorance as to the width of crossing demanded by such a machine, unless such knowledge

could be imputed to them from the fact that such implements were in general use in the wheat belt. No claim is made that the company had actual knowledge that a wider crossing was necessary, but it is said that it ought to have had from the fact that the crossing in question was in what is known as the wheat belt of Kansas. One or two traveling men testified that the machines were in general use in that section and required a crossing of eighteen or twenty feet wide to let them over a railroad-track. If such knowledge is to be presumed on the part of the railroad, it must, by the same reasoning, be presumed on the part of the farmer. Yet the jury found that Stredder thought the crossing was sufficient to take the harvester safely over, and he was possessed of actual and practical knowledge of its workings, and owned large wheat fields of over 200 acres. The company must have had knowledge of the increased width of such machines before it would be required to widen its crossings. The jury found that Stredder had as much knowledge of the character and condition of the crossing as the railroad company had, and of the Deering binder, and of the breadth of crossing required by it when pulled by three horses.

If, then, their knowledge was equal, the railroad company could have had no notice or intimation that the crossing was unsafe for the passage of the machine, for Stredder had none. If the actual users of these machines were ignorant of the fact that a crossing more than fourteen feet wide was demanded to permit their safe moving from one side of a railroad to another, to whom else could the railroad company go for better information on this subject, if it started upon an inquiry? Certainly the traveling salesmen were not higher authority. Besides, the jury found that Deer-

ing binders like this were not in general use in the vicinity of the crossing in question prior to the time of the accident. This finding is at variance with the testimony given by the traveling men.

The established facts in this case ought not to be smothered under contrary presumptions.